FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 1 0 2012 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**MEMORANDUM,
ORDER, AND
JUDGMENT**

A.A.M.,

Petitioner,

- against -

J.L.R.C.,

Respondent.

11-CV-5732

**Appearances:**

For the Petitioner:

> Christopher M. Strongosky
> Leeanne Sara Neri
> DLA Piper US LLP
> New York, NY

For the Respondent:

> Steven Ross
> Ross & Asmar LLC
> New York, NY

JACK B. WEINSTEIN, Senior United States District Judge:

Table of Contents

I.    Introduction.................................................................................................. 2
II.   Factual Background ...................................................................................... 2
          A.    Findings of the Court........................................................................ 2
          B.    Reaction of Mother........................................................................... 5
III.  Procedural History ....................................................................................... 6
IV.   Law ............................................................................................................... 8
          A.    The Hague Convention and Implementing Federal Legislation ............ 8
                  1.    General Principles................................................................... 8
                  2.    Explanation of Statutory Terms and Affirmative Defenses ............ 10
          B.    Choice of Law .................................................................................. 13
          C.    Mexican Custody Law ..................................................................... 17

1

      D.    Mexican Contract Law ............................................................................ 18

V.   Application of Law to Facts............................................................................... 18

      A.    Hague Convention Applicability: Age Limitation ............................. 19

      B.    Habitual Residence of the Child............................................................ 19

      C.    "Wrongful" Retention: Application of Mexican Custody and Contract Law ..... 22

          1.    Wrongful Retention Generally ...................................................... 22

          2.    Effect of the Agreement ................................................................ 23

      D.    Affirmative Defenses ............................................................................ 24

VI.  Conclusion ......................................................................................................... 25

## I.   Introduction

Petitioner (the "mother"), who is a Mexican resident and citizen, and the mother of a five-year-old Mexican-born daughter, E.M.A.R. (the "child"), brings a petition seeking the return of her child from the respondent (the "father"), a citizen of Mexico and a resident of the State of New York. The mother seeks an order compelling the father to return their child, who is kept by him in New York, to Mexico.

Pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "the Convention") and the United States' implementing statute, the International Child Abduction Remedies Act ("ICARA" or the "Act"), 42 U.S.C. §§ 11601-11611, for the reasons stated below, the court finds that the father is improperly retaining physical custody of the child in the United States. She is ordered returned to her mother in Mexico.

## II.   Factual Background

### A. Findings of the Court

Despite some contradictory testimony, the following facts have been established by a preponderance of the evidence.

The mother and father married in Puebla, a small city in southern Mexico, in March 2006. Both had extended families there. Some 70 percent of the adult males from Puebla travel

illegally to the United States so that they can provide economic support for their families at home. The city has limited economic opportunities.

The child was born of the marriage in September 2006. She lived with both parents in Puebla for six months. Her father then left the conjugal residence, entered the United States illegally, and traveled to Queens, New York. He is employed full-time in this country and earns substantial wages. After he left Mexico for the United States, the mother had complete physical control of the child.

For approximately three and a half years, the child was well cared for in Mexico by her mother. Both received regular voluntary support from the father. The mother and child communicated with the father regularly by telephone. In the spring of 2010, the parents agreed that the mother and child would come to New York, where the three would live together.

Arrangements the parents agreed upon by telephone were as follows. The mother and her uncle, A.S. (the "uncle"), accompanied by the child, were to travel by air from Puebla to Nogales, Mexico, a city located close to the border between Arizona and Mexico. Many persons seeking to enter the United States illegally do so near Nogales. The mother was sent money by the father so she could arrange for a person or persons to smuggle the child across the border. Immediately thereafter, the mother and her uncle were to cross illegally into the United States, and, accompanied by the child, were to travel to New York to join the father. There, the parents were to share joint custody of the child in their new marital abode.

Using money supplied by the father, the mother arranged for two women to take the child across the border while she and her uncle stayed in Nogales with smugglers. These individuals had also been retained by the mother to help her and her uncle sneak into the United States through the desert. Despite their repeated attempts to enter the United States, the two adults

3

were blocked by American border guards. Each time, they were returned to Mexico. In the meantime, the child had arrived in New York and was being cared for by her father.

After some time in a Mexican safe house supplied by the smugglers, the mother procured false identification for herself and her uncle. They used these papers to cross into the United States. Apprehended, they were punished criminally for using false identification. Each served 75 days in prison before being expelled to Mexico.

It was by then apparent that the plan for the mother to enter the United States and travel to New York had been, and would continue to be, frustrated. Another illegal attempt to enter would have meant risking a long prison term.

The father began cohabiting with another woman. She has just given birth to their son. The father, his paramour, and their son live together in New York, along with the child.

Since there are many emigrants from the Puebla community in New York, the mother soon learned of the new woman in her husband's life who was helping to care for the child. It became apparent that respondent would send no more money to Mexico to support petitioner. And he insisted that he would keep sole custody of the child in New York.

Desperate, the mother contacted the Mexican authorities for help in obtaining the child. *See generally* Part III, *infra*. It was by then clear that she could never immigrate to the United States, and that the father would never voluntarily send the child back to Mexico.

During the bench trial the child was put on the phone so that she could listen to, and speak with, her mother. Although she appeared somewhat shy—an understandable reaction, given her age and the setting—she was obviously delighted to hear her mother's voice. It was clear that a warm relationship continued to exist between the two.

4

The child has been well cared for by the father and his consort. But, without swift intervention by the court, the new family that respondent has established in this country will completely absorb the child, leaving the mother in Mexico bereft and forgotten.

Rejected as not credible is the mother's testimony that the father hired the smugglers to take the child across the border and that he arranged for the procurement of false papers. It is highly unlikely that, as she testified, she gave her young child to people that she had never seen before, so that they could take the infant across the border for a short visit with the father in Arizona. Her testimony that she and her uncle were voluntarily taken in by good Samaritans for weeks in Nogales while they repeatedly attempted to cross the border is also rejected as unbelievable; these criminals were selected by the mother to assist with her planned illegal entry. Petitioner and her uncle did not have return tickets from Nogales, which suggests that they did not plan to return to Puebla. Despite the mother's lack of credibility on these points, she has established the facts described above by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(1). The applicable evidentiary standards in Convention cases are described below. *See generally* Part IV.A, *infra*.

### B. Reaction of Mother

In a telephone call recorded by the mother in February 2011, before she brought this petition, she appears to be threatening and hysterical. Her emotional state is understandable. By that time, she had been unable for some months to join her husband and daughter in New York, and it was certain that the father would never return the child to Mexico voluntarily. Another woman had established a romantic relationship with her husband and appeared poised to become in effect the child's stepmother, replacing the mother permanently.

"Heaven has no rage, like love to hatred turned, nor Hell a fury, like a woman scorned."
The Yale Book of Quotations 168 (Fred R. Shapiro, ed., 2006) (quoting William Congreve, *The Mourning Bride* (1697)).  Neither the mother's perjury nor her threats to her husband to physically have him injured, made in a state of extreme emotional turmoil, provide a basis for avoiding application of the Convention.  The court is satisfied that were the child to be returned to her mother in Mexico, she would be loved and properly cared for.

**III.    Procedural History**

In October 2010, the mother filed a request for legal assistance with the Mexican government.  *See* Request for Legal Assistance (Ex. C. to Petition).  In November 2010, Mexico formally applied to the government of the United States for the child's return.  *See* Request for Return (Ex. C to Petition).  Some six months later, in April 2011, the United States Department of State contacted the father by letter.  The State Department informed him that the Mexican government had forwarded his wife's application, and it requested that he "consider voluntarily agreeing to return the child to Mexico in order to avoid the applicant's initiation of legal proceedings in the United States under the Hague Convention."  April 11, 2011 Letter 1 (Ex. 6 to Petition).  The State Department noted additionally that, pursuant to ICARA, "a court that orders return of the child under the Convention *shall* also order the taking party to pay necessary expenses incurred by or on behalf of the petitioner."  *Id.* (emphasis added); *see* 42 U.S.C. § 11607(b)(3).  The State Department requested that he advise a case officer "as to when and how the child will be returned to Mexico"; and it informed him that if he did not take appropriate action, the United States government would "be obligated . . . to take all appropriate measures to facilitate the initiation of judicial proceedings by [the mother] to seek return of the child."  April 11, 2011 Letter 1-2 (Ex. 6 to Petition).

6

Less than two weeks after the State Department contacted the father, he filed a petition in New York Family Court seeking sole physical and legal custody of the child. *See* Petition for Custody (Ex. 7. to Petition). Shortly thereafter, the State Department sent a letter to the appropriate state-court referee, informing her that "an application for the return of [the child] to Mexico . . . has been received by the Department of State," and that Article 16 of the Convention required the Family Court to postpone the adjudication of respondent's custody petition unless and until it was determined that the child was not to be returned to Mexico pursuant to ICARA. *See id.*; *see also* Hague Convention, art. 16 (providing that "[a]fter receiving notice of a wrongful removal or retention in the sense of Article 3, the judicial . . . authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits the rights of custody until it has been determined that the child is not to be returned under this Convention").

The Family Court has not acted on the father's custody petition. This court enjoined the parties from taking further action regarding that petition until the present dispute under the Convention was resolved. *Cf. Yang v. Tsui*, 416 F.3d 199, 203 (3d Cir. 2005) (noting that, pursuant to the Hague Convention and ICARA, "it is the custody determination, not the Hague Convention Petition, that should be held in abeyance if proceedings are going forward in both state and federal courts.").

With the aid of interpreters, a bench trial was held. Petitioner and her witnesses testified by telephone. The parties were given the opportunity to conduct discovery. They have submitted extensive briefs, supplemented by the court's own research.

The parties were invited to present evidence on Mexican law, by experts and otherwise. *See* Order, No. 11-CV-5732 (E.D.N.Y. Dec. 22, 2011), CM/ECF No. 20; Fed. R. Civ. P.

7

26(a)(2); Fed. R. Civ. P. 44.1.  They submitted scant evidence regarding Mexican law, and did

not proffer expert testimony.  In determining an issue of foreign law, the court "may consider

any relevant material or source, including testimony, whether or not submitted by a party or

admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.

## IV.    Law

### A. The Hague Convention and Implementing Federal Legislation

#### 1.  General Principles

"The Hague Convention was adopted in 1980 'to protect children internationally from the

harmful effects of their wrongful removal or retention and to establish procedures to ensure their

prompt return to the State of their habitual residence, as well as to secure protection for rights of

access.'" *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005) (quoting Hague Convention,

preamble).  It is intended "to secure the prompt return of children wrongfully removed to or

retained in any Contracting State," and "to ensure that rights of custody and of access under the

law of one Contracting State are effectively respected in the other Contracting States."  Hague

Convention, art. 1.  "The Convention . . . places at the head of its objectives the restoration of the

*status quo*, by means of the prompt return of children wrongfully removed to or retained in any

Contracting State." *Gitter*, 396 F.3d at 130 (internal quotation marks omitted).  Stated in simpler

terms, "[t]he object of the Convention is to dissuade parents and guardians from engaging in

gamesmanship with a child's upbringing in order to secure an advantage in an anticipated

custody battle." *Id.* at 134.

Protections provided by the Convention "apply to any child who was habitually resident

in a Contracting State immediately before any breach of custody or access rights."  Hague

Convention, art. 4.  Its protections do not apply to children who are sixteen years of age or older.

*See id.* Both the United States and Mexico are signatories to the Hague Convention; the United States ratified the treaty in 1988 and Mexico did so in 1991.

The Convention provides that "Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention." Hague Convention, art. 2. Complying with the obligations imposed by the treaty, in 1988 Congress passed, and the President signed, the International Child Abduction Remedies Act, Pub. L. No. 100-300, 102 Stat. 437 (codified as amended at 42 U.S.C. §§ 11601-11611). The Act provides that courts adjudicating return petitions "shall decide the case in accordance with the Convention." 42 U.S.C. § 11603(d). It sets forth procedures for the courts of the United States—and the courts of the states, since ICARA provides for concurrent jurisdiction in the state and federal courts, *see* 42 U.S.C. § 11603(a)—to follow when a petition seeking the return of a child is filed. *See generally* 42 U.S.C. § 11603. ICARA and the Hague Convention "empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); *see also* Hague Convention, art. 19; *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993).

ICARA provides that "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such an action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 42 U.S.C. § 11603(b).

The substantive rules and procedures set forth in ICARA and the treaty are extensive. In brief, a petitioner seeking the return of a child pursuant to the Hague Convention and the Act

9

must demonstrate that the removal or retention of the child from the State in which the child was "habitually resident" was "wrongful." *See* 42 U.S.C. § 11603(e)(A); Hague Convention, art. 3; *Gitter v. Gitter*, 396 F.3d 124, 130 (2d Cir. 2005). If she does so by a preponderance of the evidence, *see* 42 U.S.C. § 11603(e), the burden shifts to the respondent to show that any of the statutorily-enumerated affirmative defenses is applicable and that the child should not be returned. *See id.* § 11603(e)(2). Whether the respondent is required to make out an affirmative defense by a mere preponderance of the evidence or by clear and convincing evidence depends on the affirmative defense proffered. *See Friedrich*, 983 F.2d at 1400. *Compare* 42 U.S.C. § 11603(e)(2)(A), *with id.* § 11603(e)(2)(B). Available affirmative defenses in Convention cases are to be narrowly construed. *See, e.g.*, *Blondin v. Dubois*, 189 F.3d 240, 246 & n.4 (2d Cir. 1999); *Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995).

If the court determines that "a child has been wrongfully removed or retained . . . and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith." Hague Convention, art. 12; *see also* 42 U.S.C. § 11603(d). "The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year[,] . . . shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Hague Convention, art. 12.

## 2. Explanation of Statutory Terms and Affirmative Defenses

"The Hague Convention, itself, does not provide any definition of 'habitually resident.'" *Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005). A number of the courts of appeals, however, have considered the issue. *See id.* (collecting cases). In *Gitter*, the United States Court of

10

Appeals for the Second Circuit set forth a guideline for courts within this circuit to use to determine whether a child was "habitually resident" in a State within the meaning of Article 3 of the Hague Convention:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Id.* at 134; *see also Mozes v. Mozes*, 239 F.3d 1067, 1073-81 (9th Cir. 2001) (Kozinski, J.). Since decisions under the Convention are fact-centered, it is important to view the standards set forth by American courts in the light of the special circumstances of the particular case.

A child's being removed or retained in a country different from that of her habitual residence is one of several necessary conditions that must be satisfied for a removal or retention to be considered "wrongful" within the meaning of Article 3 of the Convention. "It is important to understand that 'wrongful removal' is a legal term strictly defined in the Convention. It does not require an ad hoc determination or a balancing of the equities." *Friedrich*, 983 F.2d at 1400.

Pursuant to the Hague Convention, the removal of a child from one country to another or the retention of a child is considered wrongful when:

*a)* It is in breach of rights of custody attributed to a person, an institution or other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

*b)* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

11

Hague Convention, art. 3.  The Convention provides that the custody rights mentioned in

Article 3(a) "shall include rights relating to the care of the person of the child and, in

particular, the right to determine the child's place of residence."  Hague Convention, art.

5.  The custody rights referenced in Article 3(a) "may arise in particular by operation of

law, or by reason of a judicial or administrative decision, or by reason of an agreement

having legal effect under the law of that State."  Hague Convention, art. 3.

     The United States Court of Appeals for the Second Circuit has succinctly

described the wrongfulness standard applicable in cases brought pursuant to the Hague

Convention and ICARA as follows:

> to prevail on a claim under the Hague Convention a petitioner must show
> that (1) the child was habitually resident in one State and has been
> removed to or retained in a different state; (2) the removal or retention was
> in breach of the petitioner's custody rights under the law of the State of
> habitual residence, and (3) the petitioner was exercising these rights at the
> time of removal or retention.

*Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).

     If a petitioner shows by a preponderance of the evidence that the removal or the

retention of the child was wrongful, *see* 42 U.S.C. § 11603(e)(1), the burden shifts to a

respondent to prove an applicable affirmative defense.  Four such defenses are available

if a respondent "opposes the return of the child."  42 U.S.C. § 11603(e)(2).

     First, a respondent may show by clear and convincing evidence that there is a

"grave risk that his or her return would expose the child to physical or psychological

harm or otherwise place the child in an intolerable situation."  Hague Convention, art.

13(b); *see* 42 U.S.C. § 11603(e)(2)(A).

Second, he may show by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20; *see* 42 U.S.C. § 11603(e)(2)(A).

Third, he may show by a preponderance of the evidence that the return proceeding was commenced more than one year after the child's removal or retention and that the child has become settled in its new environment. Hague Convention, art. 12; *see* 42 U.S.C. § 11603(e)(2)(B).

And, fourth, he may show by a preponderance of the evidence that "the person, institution, or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a); *see* 42 U.S.C. § 11603(e)(2)(B).

**B. Choice of Law**

Analysis of the arrangement between the mother and the father in the instant case suggests the need for a choice-of-law analysis to determine which jurisdiction's law governs their agreement. In federal question cases, such as the present one, federal courts generally apply federal, rather than state, choice law analysis to determine which jurisdiction's substantive law is applicable. *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 12-15 (2d Cir. 1996); *see, e.g., Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l., Inc.*, 198 F.3d 88, 95-96 (2d Cir. 1999); *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980); *see also* Symeon C. Symeonides, *Choice of Law in the American Courts in 2011: Twenty-Fifth Annual Survey*, 60 Am. J. Comp. L. (forthcoming 2012). Federal choice of

law rules require a court to "determine which state law to use by ascertaining and valuing points of contact between the transaction giving rise to the cause of action and the states or governments whose competing laws are involved." *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 162 (2d Cir. 1998) (internal quotation marks and bracketing omitted). Federal courts frequently consult the factors enunciated by the Restatement (Second) of Conflict of Laws in making this determination. *See Pescatore*, 97 F.3d at 12.

The Restatement's generally accepted "most significant relationship" test is applicable in both tort and contract cases. *Compare* Restatement (Second) of Conflict of Laws § 145 (torts), *with id.* § 188 (contracts). In a contract case in which the choice of substantive law is in dispute due to the parties' failure to explicitly provide which jurisdiction's law governs, the "rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." *Id.* § 188 (1). The Restatement (Second) provides additionally that:

> In the absence of an effective choice of law by the parties . . ., the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Id.* § 188 (2).

14

The Restatement (Second) provides that a variety of factors are to be considered in determining which jurisdiction has the most significant relationship with a dispute. The factors courts are to consider include:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

*Id.* § 6 (2).

The standard provided by the Restatement (Second) has not been the only one utilized by federal courts in determining which law to apply in federal-question cases. "[I]n other circumstances, courts have used the choice of law rules of the state in which the court sits instead of a federal common law choice of law rule." *Pescatore*, 97 F.3d at 12; *see also Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 959-61 (2d Cir. 1991). "The law is unsettled when it comes to applying either a federal common law choice of law rule or state choice law principles in non-diversity cases." *Pescatore*, 97 F.3d at 12.

New York's choice of law rule is for all practical purposes identical to the one set forth in the Restatement (Second). New York courts, following Chief Judge Stanley Fuld's analysis in *Neumeier v. Kuehner*, 286 N.E.2d 454 (N.Y. 1972), recognize "the use of 'center of gravity' or 'grouping of contacts' as the appropriate analytical approach to choice of law questions in contract cases." *Zurich Ins. Co. v. Shearson Lehman Hutton*, 642 N.E.2d 1065, 1068 (N.Y. 1994). "The purpose of grouping contacts is to establish which State has 'the most significant relationship to the transaction and the parties.'" *Id.* (citing the Restatement (Second) of Conflict of Laws § 188 (1)).

15

Still other federal courts, in adjudicating actions brought pursuant to ICARA, have concluded that the Hague Convention requires courts to conduct a choice-of-law analysis pursuant to the law of the state where the child was habitually resident. *See, e.g.*, *Whallon v. Lynn*, 230 F.3d 450, 456 & n.6 (1st Cir. 2000).

The court need not decide between these competing approaches; under any of the standards discussed above, Mexican law governs in this case both as to the scope of the mother's permanent custody rights and the agreement between the mother and the father.

The Convention itself dictates this result with respect to the substantive content of the mother's custody rights, since, as discussed below in Part V.B, *infra*, the child was habitually resident in Mexico. *See* Hague Convention, art. 3(a) (requiring a court to determine whether a removal or retention was "in breach of rights of custody . . . *under the law of the State in which the child was habitually resident immediately before the removal or retention*" (emphasis added)). Mexico's federal law governs with respect to the scope of petitioner's custody rights for Convention purposes, and supersedes any Mexican state's law to the contrary. *See, e.g.*, José Antonio Márquez González, *Family Law in Mexico* 80 n.1 (2011) (noting that the code of the Mexican State of Puebla does not define the concept of "parental authority," the Mexican analog to the American law of custody). In any event, no law to the contrary has been established or briefed.

Mexican federal law similarly governs the agreement between the petitioner and the respondent for purposes of this case. No refuting argument has been made by the parties, nor has any contrary evidence been offered. The agreement for shared custody was made in Mexico by two individuals then resident in Mexico, and they had no reason to think that the law of another

16

jurisdiction would apply.  Petitioner still resides in Mexico, and that country has a legitimate and substantial interest in having its law applied to this dispute.

Mexico has a strong interest in protecting its citizens' justifiable expectations.  Any interest of New York, the only other jurisdiction that by virtue of the father's residence has any substantial connection to this litigation, is ephemeral and transient.

### C. Mexican Custody Law

Mexico's law of custody is known as *patria potestas*; translated into English, it is defined as the law of "parental authority."  *See, e.g.*, Patricia Begné, *Parental Authority and Child Custody in Mexico*, 39 Fam. L. Q. 527, 527-28 (2005).  "Most of the [state] codes in the Mexican Republic[, including that of Puebla], do not define parental authority."  González, *supra*, at 80 n.1.

A number of features of the law of parental authority appear to be shared by the various Mexican states.  Authority is exercised jointly by both parents.  *See id.* at 81.  Parental authority ends when a child reaches the age of 18; before that time, it may be temporarily suspended because of a parent's personal problems, such as the abuse of alcohol or drugs, removed by a judge for various reasons, or it may be validly waived by a parent in limited circumstances.  *See id.* at 84.

"The first right that arises from parental authority is the one of shelter."  *Id.* at 81.  Parents exercising their authority "always keep . . . the right to shelter their descendants."  *Id.*  Put slightly differently, "[c]ustody and care of their minor children is the first duty of parents.  Custody refers to being with and care for the child.  Mexican courts refer to guarda y custodia, the two terms being understood as synonymous."  Begné, *supra*, at 531.

17

Under Mexican law, "[t]he exercise of parental authority . . . gives rise to a duty of custody and care. It is noteworthy that Mexican courts use the terms *cuidado y custodia* (care and custody), implying that custody and care go hand in hand." *Id.* at 533. "These principles have been ratified by the Mexican Supreme Court, which has ruled that, 'One of the prerogatives of parental authority is the custody, care, and attention of minors. Custody cannot be understood separately from the *physical supervision* of the children, because that connection is a means to protect them, raise them, physically and spiritually, and provide for them.'" *Id.* at 534 (emphasis added) (quoting Amparo Directo 8236/86, Manuel Armas Vázquez y otra (1988)).

### D. Mexican Contract Law

Mexican contract law rules are set forth in the Mexican Civil and Commercial Codes. *See* Rona R. Mears, *Contracting in Mexico: A Legal and Practical Guide to Negotiating and Drafting*, 24 St. Mary's L.J. 737, 742 (1993). "To identify the applicable law governing a contract, . . . the first step is to determine whether the contract is civil or commercial. The Commercial Code explicitly describes as commercial certain types of acts or contracts." *Id.* (footnote omitted). "All other acts or contracts are deemed civil and are subject to the provisions of the Civil Code." *Id.*

"The two elements required for the existence of a contract under the Civil Code" are: "(1) consent or the act of agreement by the parties regarding the contract; and (2) an object for the contract that may be either the act that the obligor must perform, or not perform, or the thing to be given by the obligor under the contract terms. Without these two elements, the contract does not exist, or, more precisely, has never been created." *Id.* at 744-45 (footnotes omitted).

### V.   Application of Law to Facts

The child is being wrongfully retained by her father in New York. Her habitual place of residence is Mexico, where her mother lawfully resides in the marital residence. The father is holding the child in New York, where he lives illegally, subject to deportation, in violation of the mother's rights of custody. There is no defense to her proven cause of action for the immediate return of the child to Mexico.

## A. Hague Convention Applicability: Age Limitation

Article 4 of the Hague Convention provides in part that that the "Convention shall cease to apply when the child attains the age of 16 years." Hague Convention, art. 4. The Convention's applicability to the child here as a matter of substantive law is discussed at more length below, but, as an initial matter, it is conceded that she is less than sixteen years of age. The mother is not barred from seeking her child's return on this basis.

## B. Habitual Residence of the Child

In determining whether a removal or retention was wrongful under the Hague Convention, a court must determine as an initial matter the country in which the child was "habitually resident immediately before the removal or retention." Hague Convention, art. 3(a). Only after doing so can the court determine whether the removal or retention was "in breach of rights of custody" under the law of that country. *See id.*

As noted above in Part IV.A.2, *supra*, the Court of Appeals for the Second Circuit has suggested an approach for courts to utilize in determining the location of a child's habitual residence pursuant to the Hague Convention:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that

19

the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005).

The fact-specific nature of cases under the Convention may indicate other, more direct ways to the conclusion regarding habitual residence. Notably, the present case illustrates why the standard set forth in *Gitter* for determining habitual residence—though useful in cases in which the child is moved back and forth between different countries, as was the case in *Gitter* itself—is insufficient to deal with every determination of habitual residence. *Gitter* is of particular utility when, for example, a child is born in country A, moves with her parents to country B, and then returns with one of the parents to country A. *See id.* at 128-29. In such a case, it is appropriate to consider both the intent of the parents and the attachment the child develops to country B.

But it is inappropriate to apply this approach in a case in which a child is born in country A and is removed by one parent to country B, or a case in which a child is born in country A and is improperly retained by a parent in country B. The parents cannot meaningfully be said to have shared an intent regarding the change in the child's residence to B, after removal from her country of initial residence, A, if the child is removed to or retained in B, contrary to the wishes of the parent remaining in country A. *See Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006). The crux of the problem in such cases is that the parents *disagree* regarding the country where the child should live in the future—and the child's pre-removal residence is ultimately crucial in making a custody determination. The pre-removal residence is particularly relevant in a case like the present one, where the mother is lawfully residing in Mexico, the site of the

permanent lawful marital residence, while the child and father temporarily reside illegally in this country and are subject to deportation at any time.

The *Gitter* standard is not appropriately applied in an A to B case such as the present one for another reason: in such a case, the child's having become acclimated to her new residence in country B seems irrelevant to the determination of whether she was habitually resident in country A immediately before the removal or retention. *See* Hague Convention, art. 3(a); *cf. Kijowska*, 463 F.3d at 587. It is necessary in a *Gitter*-type case to consider whether a child born in country A, taken jointly by his parents to country B, and then removed by one of the parents back to country A was habitually resident in country B; the basic theory underlying the inquiry in that case is that the child's habitual residence might have shifted, given the passage of time and the accretion of life experiences in country B. *See Gitter*, 396 F.3d at 133-34. Removal by one parent back to country A might then be wrongful within the meaning of the Hague Convention. But in the second set of cases—into which the instant case fits—the child's having become acclimatized to country B seems to have no bearing on whether the child was habitually resident in country A immediately before the wrongful removal or retention. This is an issue of critical import under the Convention.

The Court of Appeals for the Second Circuit made it clear in *Gitter* that, "at its core, habitual residence is a 'description of a factual state of affairs.'" *Id.* at 133 n.8 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001)). In this case, that state of affairs is obvious. Until she was removed into the United States and illegally retained here, the child had lived her entire life in Mexico with the consent of both parents in their marital abode. Her parents shared an intent for the child to move to the United States only if she could join a household including her mother and father. That intent was conditioned on all three of the family members successfully

21

entering the United States.  But their shared intent does not change the fact that, before her entry into the United States, and her retention here, the child was born in Mexico and had never resided outside that country.  The child was habitually resident in Mexico before her removal and unlawful retention by the father in the United States.

Since the child was habitually resident in Mexico before her parents' plan for all three to move to the United States resulted in her being separated from her mother, it is to be determined by this court whether the child's removal to the United States was—or her retention in this country is—in breach of petitioner's custody rights under Mexican law.  Second, the court will determine whether those rights were actually exercised, or would have been, by the mother.  *See* Hague Convention, art. 3.

### C.  "Wrongful" Retention: Application of Mexican Custody and Contract Law

#### 1.  Wrongful Retention Generally

It is undisputed that Mexican custody law confers upon the petitioner the right to keep physical custody of her child in her home—with or without the presence of her voluntarily-departed husband—absent the suspension, loss, or forfeiture of her parental authority.  *See* González, *supra*, at 83-84.  Petitioner's right to shelter and care for her child is a "right[] of custody" under the Convention.  The treaty states that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Hague Convention, art. 5(a); *see also Abbott v. Abbott*, 130 S. Ct. 1983, 1990-91 (2010).

This right would have been exercised by the mother in Puebla "but for . . . the retention" by the father in New York.  *See* Hague Convention, art. 3(b).  Petitioner was exercising her

custody rights before the child illegally entered the United States and intends to do so again when the child is returned.

Because the child is being retained in New York without her mother's consent, in violation of petitioner's right of custody under Mexican law, respondent's retention of the child in the United States is wrongful under the Convention, unless the parties' agreement compels a different conclusion. *See* Hague Convention, art. 3.

### 2. Effect of the Agreement

No agreement between the parties requires a different conclusion with respect to the wrongful nature of the retention in New York by the father. The agreement for the mother, child, and father to create a new marital abode in New York was conditional on all of the family members entering the United States. Even assuming that that "contract" for shared custody in New York after the planned illegal entry was enforceable, it was frustrated and impossible of effectuation, becoming null and void. *See generally* Restatement (Second) of Contracts §§ 261, 265 (1981). No consent for retention in the United States without the mother's permission was given.

Because the agreement between the mother and the father—that the entire family would reside in the United States in a new marital abode, with the parents sharing custody of their daughter there—was conditional upon the entry of all members of the family into the United States, the petitioner cannot be said to have consented to the retention of her child in the United States, when she was prevented by American law from entering this country. *See also* Part V.D, *infra*. The retention of the child is therefore "wrongful" within the meaning of the Hague Convention, and the child must be ordered returned unless the respondent establishes one of the applicable affirmative defenses. *See* Hague Convention, art. 12.

### D. Affirmative Defenses

None of the affirmative defenses available under the Convention and ICARA are sufficient to overcome petitioner's showing that respondent's retention of the child in the United States is wrongful. As noted above, four affirmative defenses are available. *See* Part IV.A, *supra*.

Respondent has not attempted to show—and he would be required to do so by clear and convincing evidence—that there is a grave risk that the child's return would expose her to "physical or psychological harm . . . or an intolerable situation." *See* Hague Convention, art. 13(b); *see also* 42 U.S.C. § 11603(e)(2)(A). He could not prevail were he to attempt to make such a showing. The evidence establishes that the child was raised in a loving, supportive home in Mexico. She faces no risk of harm, physical or psychological, upon her return. Puebla itself, while less sophisticated that New York, is an internationally-known and cultured tourist attraction. *See, e.g.*, *45 Places to Go in 2012*, N.Y. Times, Jan. 8, 2012, at Tr. 5.

The father has not attempted to demonstrate, nor could he, that the United States' "fundamental principles . . . relating to the protection of human rights and fundamental freedoms" ought to be held to bar the return of the child. *See* Hague Convention, art. 20; *see also* 42 U.S.C. § 11603(e)(2)(A). No statute of limitations defense has been raised or proven. *See* Hague Convention, art. 12; *see also* 42 U.S.C. § 11603(e)(2)(B).

Respondent argues that petitioner "consented to . . . the removal [and] retention." Hague Convention, art. 13(a); *see* 42 U.S.C. § 11603(e)(2)(B). Citing *Gonzalez-Caballero v. Mena*, 251 F.3d 789 (9th Cir. 2001), and *In re Kim*, 404 F. Supp. 2d 495 (S.D.N.Y. 2005), he contends that the mother consented to the child's being removed to, and retained in, the United States; that there is no evidence that her consent was conditional; and that, in any event, her putative consent

24

to the removal bars her from objecting to the retention. *See* Respondent's Post-Trial Brief 5-8, No. 11-CV-5732 (E.D.N.Y. Jan. 8, 2012), CM/ECF No. 23; *see also* January 9, 2012 Hearing Transcript. The statute requires him to prove this affirmative defense by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). Respondent's arguments are rejected. Petitioner's conditional consent to the child's removal to the United States is not operative in the present dispute. As noted already, it was dependent on the family's establishment as a unit in New York. Petitioner's consent to the removal, given conditionally, did not operate to divest her of her right to object to the retention. *Cf. Baxter v. Baxter*, 423 F.3d 363, 370-71 (3d Cir. 2005). *But cf. Gonzalez-Caballero*, 251 F.3d at 794.

Respondent's claim that petitioner is estopped from objecting to the retention of the child by her earlier consent ignores the conditional nature of her agreement. The fact that the agreement in *Gonzalez-Caballero* was unconditional and the agreement here was conditional— and impossible of effectuation—makes inapplicable the cases cited by the respondent. *See Gonzalez-Caballero*, 251 F.3d at 794; *In re Kim*, 404 F. Supp. 2d at 516-18. The respondent has not, as a matter of fact and law, met his burden in attempting to prove consent by the petitioner.

The additional affirmative defenses raised by respondent in his answer appear to have been abandoned. *Compare* Answer to Petition 4, No. 11-CV-5732 (E.D.N.Y. Dec. 3, 2011), CM/ECF No. 6, *with* Respondent's Post-Trial Brief 5-8, No. 11-CV-5732 (E.D.N.Y. Jan. 8, 2012), CM/ECF No. 23. In any event, they are without merit. The mother's petition is verified, and, as stated above, she was exercising her custodial rights at the time the child was removed to the United States. She would be doing so presently were it not for the wrongful retention.

## VI.    Conclusion

The child is ordered returned to Mexico forthwith. This memorandum, order, and judgment constitutes the court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). Judgment shall be immediately entered in favor of the petitioner by the clerk of the court. Respondent shall pay the petitioner's court costs, as well as the transportation costs related to the child's return. *See* 42 U.S.C. § 11607(b)(3). The judgment is stayed for 10 days to allow an application to the Court of Appeals for the Second Circuit for a further stay.

The parties shall provide a detailed proposal for the safe return of the child at a hearing on January 13, at 10:00 a.m. The child and person or persons designated to accompany the child to her place of abode and the custody of her mother in Mexico shall be present at this hearing.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   January 9, 2012
        Brooklyn, New York

26